# In the United States District Court
# for the
# Western District of Texas

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | |
| § | SA-12-CR-642-XR |
| OMAR JOSE CALZADA § | |

## ORDER

On this day came on to be considered Defendant's motion to suppress (docket no. 35).

### Background

The Defendant is charged in an indictment with conspiracy to manufacture more than 100 marijuana plants and aiding and abetting the manufacture of more than 100 marijuana plants.

On June 28, 2012, Detective Chad Culp signed and swore to an affidavit in support of a search warrant. The affidavit stated, in relevant part, that he has been employed as a police officer for twelve years and he has been assigned to the Narcotics Unit performing narcotics investigations for three years; that marijuana was being unlawfully grown at 10211 Dancing Brook, and the premises were under the control of Frank Ybarra III and Omar Jose Calzada. He stated that he talked to neighbors and they informed him that they rarely saw anyone at the house and they never saw furniture moved into the residence.

Det. Culp stated that in mid-March 2012, he received information that the residence "was being used for a marijuana grow." He established surveillance at the residence and observed Ybarra and Calzada arrive at the location. He had earlier performed "computer research" to identify Ybarra and Calzada. He saw Calzada open the garage door and enter the house. He was aware that the utilities for the house were under Ybarra's name.

While conducting his surveillance he "observed bright fluorescent lights coming from the upstairs windows on the south side of the house."

The affidavit further stated that on June 8, 2012, a Detective Schneider established surveillance at the house and observed Ybarra and Calzada leave the house through the front door and lock it with a key. They drove off in Ybarra's Audi. The vehicle was subsequently stopped for a traffic violation. Ybarra and Calzada both gave addresses other than Dancing Brook as their residence.

On June 27, surveillance was once again established at the house. Det. Culp saw Calzada arrive at the location, stay for about an hour, and then leave. After Calzada left the house, Det. Culp went into the next door neighbor's backyard. Det. Culp stated in the affidavit that he could smell marijuana coming from 10211 Dancing Brook. He also stated that with binoculars he was "able to see a growing marijuana plant through the exposed crack in the window, that was not covered by the shade and emitting fluorescent light."

Finally, in the affidavit, Det. Culp stated that "Ybarra turned on CPS power to the location in March 2012. From March to April, 2856 kw of electricity was used. From April to May, 2922 kw of electricity was used. From May to June, 7091 kw of electricity was used. The previous residents used 564 kw of electricity their last month living there, January of 2012."

On June 28, the search warrant was issued at approximately 5:00 p.m. At approximately 7:30 p.m., law enforcement officers saw Calzada enter the house using a key. Calzada stayed at the house for approximately 15 minutes and then left. Calzada's vehicle was subsequently stopped by a police officer. Inside Calzada's vehicle a mason jar containing high grade hydroponic marijuana was found in a bag. The Defendant was returned to 10211 Dancing Brook, where the search warrant was executed. When law enforcement officers entered the

house, they noticed a strong odor of marijuana. They found and seized 751 marijuana plants, as well as other evidence located throughout the house, showing a large scale marijuana growing operation. In addition, in the kitchen, officers found numerous receipts in the Defendant's name, showing that he had purchased components used in the growing operation on eBay. The Defendant denied any knowledge of the marijuana growing operation.

## Defendant's motion to suppress

Calzada seeks suppression of the marijuana plants and other evidence located in the house, the records obtained regarding electricity usage, the jar containing high grade hydroponic marijuana found in the vehicle, and the key to the house found on his person. He argues that the affidavit signed by Det. Culp was "bare bones"; Det. Culp failed to establish the veracity of the informant; his statement that the house was vacant was unfounded; he failed to demonstrate to the magistrate where he obtained the kw electricity consumption numbers[1]; he failed to establish any causal connection between the kw numbers he cited and marijuana growth; his statement was "specious" that when he was next door in the neighbor's yard he smelled marijuana; Det. Culp misled the magistrate by incorrectly citing one of the kw electricity consumption numbers; Det. Culp failed to disclose to the magistrate that there were similar consumption numbers for nearby houses; Det. Culp engaged in a warrantless search of the house by climbing on the neighbor's roof and using binoculars to peer into the residence; Det. Culp failed to disclose to the magistrate that he climbed a neighbor's roof to utilize his binoculars; and Det. Culp engaged in a warrantless search by accessing the electricity consumption numbers for the residence. With regard to the vehicle, Defendant argues that the stop of his vehicle took place 4.4 miles from the house and violates the recent holding by the Supreme Court in *United States v. Bailey*.

---

[1] Defendant appears to argue that Det. Culp fabricated the numbers because emails indicate the information was relayed from City Public Service on July 3, 2012, days after the search.

The Government argues that Calzada lacks standing to challenge the search warrant.

**Evidentiary Hearing**

On March 12, 2013, the Court held an evidentiary hearing regarding the motion to suppress. The Defendant testified during this hearing pursuant to *Simmons v. U.S.*, 390 U.S. 377 (1968). The Defendant testified as follows: He possesses an associate's degree in horticulture and characterized himself as being an expert regarding greenhouses. He and his childhood friend, Frank Ybarra, leased the premises at 10211 Dancing Brook with the intention of growing marijuana there. He and Ybarra had exclusive control over the premises. Although he did not sign the lease, he had an agreement with Ybarra to pay half the rent. The lease began on or about March 1, 2012. Utilities for the house were under Ybarra's name. Calzada had a key to the house. Calzada covered each of the windows to prevent anyone from looking into the premises. Calzada kept a sleeping bag inside the house. He also had a couch, entertainment center and table inside the house. From the beginning of March until his arrest on June 28, he slept at the house on ten to fifteen occasions. His residence was his mother's home. Calzada works as a fishing guide, so for a few months he kept a boat at the premises (until the homeowner's association notified him that he could no longer do so). Calzada also kept some fishing gear inside the house. He testified that he stayed overnight on some occasions to tend to the marijuana growing operations and sometimes he stayed at the premises to avoid the extra drive to his mother's home.

At the hearing the Government stipulated that Calzada had a subjective expectation of privacy in the premises.[2]

---

[2] The Government, however, maintains that the Defendant's expectation of privacy is one society would *not* recognize as reasonable.

4

The Government called Det. Chad Culp to testify at the hearing. He testified that he has been a San Antonio Police Officer for over 13 years and has been assigned to the narcotics unit since 2008. Det. Culp stated that he formerly owned a home on the cul-de-sac where 10211 Dancing Brook is located. He testified that the neighbors on that cul-de-sac are extremely close and that one of his former neighbors called him in March, informing him that he suspected 10211 Dancing Brook was being used to grow marijuana. The neighbor saw fluorescent lights at the house and heard sawing and hammering noises in the newly renovated house. After receiving this phone call, Det. Culp personally investigated. Standing on the street of the cul-de-sac, Det. Culp personally observed fluorescent lights emanating from a window on the premise's second floor. He set up surveillance at the house and a number of neighbors provided the license plates of the vehicles visiting the house. Det. Culp ran the license plates, obtained photographs, showed the neighbors the photographs, and the neighbors confirmed the identities as the persons they had seen at the house. On one occasion Det. Culp personally observed Calzada at the house.

On June 8, Det. Schneider performed surveillance at the house. When he saw Calzada and Ybarra there and later drive away, Det. Schneider called police officers to stop the vehicle to confirm their identities. When stopped by the police officer, both Calzada and Ybarra gave addresses other than 10211 Dancing Brook as their residences.

On June 26 or 27, Det. Culp called the police department's regional intelligence center (SARIC) and requested the electric company's consumption figures for the house. He was verbally supplied with assorted information.[3]

---

[3] Mar. 6 – Apr. 4 – 2856 KW - $252.06
   Apr. 5 – May 3 – 2922 KW - $239.08
   May 4 – June 5 – 7091 KW - $723.71

5

On June 27, Det. Culp saw Calzada arrive at the premises and then leave. Shortly thereafter, with the permission of the neighbor, Det. Culp entered into the neighbor's backyard. Upon walking between the houses, Det. Culp testified that he began to smell hydroponic marijuana and that the smell was coming from 10211 Dancing Brook. The neighbor suggested to Det. Culp that he use his ladder and climb his roof to see if he could better see the window displaying cracks and emanating fluorescent light. Det. Culp did so and with the use of binoculars he saw marijuana plants.

On June 28, Det. Culp swore an affidavit. He explained to the magistrate his knowledge of the location, his climbing the ladder to look at the window and the neighbors' involvement. He chose not to include those details in the affidavit in order to protect the identities of the various neighbors/private citizen informants.

On that same day the search warrant was executed. The warrant team decided to wait for Calzada to leave the premises and detain him once he left. The patrol car, however, was unable to pull Calzada's vehicle over until some four miles from the scene.

## Analysis

### A. Standing to challenge the search of the house

Defendant argues that he has standing to suppress the search of the house because he was given a key to the house, slept there on "multiple occasions," kept a sleeping bag there, had personally sealed the windows to block exterior visual access, and kept his truck and/or boat inside the garage. The Government argues that the Defendant was not a lessee of the premises,

---

01/01/12 – 02/01/12 – 564 KW – D. Hawkins

1,138 KW – 1,353 KW

See Gov't Ex. 2 admitted during the suppression hearing.

was not "residing" at the house, and never identified to law enforcement officers that he resided at the house.

The defendant bears the burden of establishing a reasonable expectation of privacy by a preponderance of the evidence. *United States v. Vega*, 221 F.3d 789, 795 (5th Cir. 2000).

A defendant lacks standing to contest the legality of a search unless he can establish that he enjoyed a "legitimate expectation of privacy" in the house at the time of his arrest. *United States v. Ibarra*, 948 F.2d 903, 905 (5th Cir. 1991) (*citing Rakas v. Illinois*, 439 U.S. 128 (1978)). Accordingly, this Court must determine whether Calzada can establish an actual, subjective expectation of privacy in the house searched or evidence seized, and whether that expectation of privacy is one society would recognize as reasonable. *See U.S. v. Wineinger*, 208 Fed. Appx. 286 (5th Cir. 2006).

Despite acknowledging that a "legitimate presence on the premises is, of course, relevant to a legitimate expectation of privacy," the Ninth Circuit in *U.S. v. Broadhurst*, 805 F.2d 849 (9th Cir. 1986) nevertheless afforded a very "generous view of what is required to demonstrate standing." *U.S. v. Gerena*, 662 F.Supp. 1218, 1246 (D. Conn. 1987). In *Broadhurst*, the Ninth Circuit gave standing to a number of defendants who never lived on the land or the premises searched by aerial surveillance. The Ninth Circuit concluded that "a formalized arrangement among defendants indicating joint control and supervision of the place searched is sufficient to support a legitimate expectation of privacy." *Broadhurst*, 805 F.2d at 852. Nor did the Ninth Circuit find convincing the argument that one of the defendants was a "mere employee" who had nothing more than the status of an invitee. *Id*. This broad view of standing has been rejected by most circuit courts. *See U.S. v. Kiser*, 948 F.2d 418, 424 (8th Cir. 1991). Likewise, this Court declines to adopt this broad interpretation.

What complicates this case is that, as stated above, the Government concedes that Calzada had a subjective expectation of privacy in the premises. The Government, however, challenges whether Calzada's expectation of privacy is one society would recognize as reasonable.

This Court has found no Fifth Circuit caselaw with facts similar to this case. Recently, however, the court in *U.S. v. Filippi*, 2013 WL 208919 (S.D. N.Y. Jan. 16, 2013), addressed a search of a warehouse that was used to grow 430 marijuana plants. One of the defendants in that case argued that he had standing to challenge the warehouse search because he worked there and because he admitted his presence at the warehouse. The defendant claimed no ownership interest in the warehouse and made no representation that he exercised exclusive use or control over the area. The district court denied the motion to suppress stating that "while under certain circumstances an employee may have a reasonable expectation of privacy in his workplace … such an expectation is 'different from and indeed less than, a similar expectation in an individual's home.'" *Id*. at *4. In *U.S. v. Cossio*, 336 Fed. Appx. 909 (11th Cir. 2009), the Court denied standing where the defendant provided inconsistent versions regarding his presence at the apartment/duplex. *See also U.S. v. Vasquez-Padilla*, 330 Fed. Appx. 883 (11th Cir. 2009)(Vasquez–Padilla expressly disclaimed any subjective expectation of privacy in the apartment by telling the officers that he did not live there, was just visiting, and could not consent to a search).

In *Minnesota v. Carter*, 525 U.S. 83 (1998), the Supreme Court made clear that "[p]roperty used for commercial purposes is treated differently for Fourth Amendment purposes from residential property." *Id*. at 90. The defendants in *Carter* were not overnight guests, "but were essentially present for a business transaction and were only in the home a matter of hours."

*Id*. Because the Supreme Court concluded that the defendants had no legitimate expectation of privacy in the apartment, they were denied standing. In accordance with this holding, the Fifth Circuit in *U.S. v. Ortiz*, 2013 WL 116668 (5th Cir. Jan. 9, 2013), stated that "whether Ortiz had a reasonable expectation of privacy in Brambila's house turns on whether the visit was primarily commercial or social." *Id*. at *2. "In assessing the nature of a visit, factors include (1) the relationship between the guest and householder, (2) the length of the visit, and (3) whether the residence was "simply a place to do business." *Id*. The Court affirmed the denial of the motion to suppress stating: "As with the defendant in *Carter*, Ortiz spent only a few hours at the residence before his arrest. Unlike the houseguest found to have an expectation of privacy in *Minnesota v. Olson*, 495 U.S. 91 (1990), Ortiz never stayed overnight there; for him, the house was "simply a place to do business." *Carter*, 525 U.S. at 90. Though his jet ski was stored in the garage as a sort of a personal favor from his cousin Gomez, Ortiz-like the defendant in *Carter*-traveled to the residence for the sole purpose of engaging in drug trafficking. *See id*. at 86. He was, at most, "merely legitimately on the premises," *see Vega*, 221 F.3d at 798, so he cannot claim a reasonable expectation of privacy in his second cousin's ex-girlfriend's sister's home."

The Fifth Circuit in *U.S. v. Vega*, 221 F.3d 789 (5th Cir. 2000), concluded that an individual had no reasonable expectation of privacy in the leased home of another where he presented no evidence that his presence in the home was anything other than commercial (in that case, the distribution of marijuana), "nor did he show that he had ever been to the residence before the day of the raid or that he had any sort of relationship with [the lessee]" prior to the day of the search and seizure. *Id*. at 797 (*citing Carter*, 525 U.S. at 90–91).

In *U.S. v. Wineinger*, 208 Fed. Appx. 286 (5th Cir. 2006), the Fifth Circuit appeared to closely regulate standing. In *Wineinger*, the defendant "was a guest in Kimberly Parker's home

9

at the time of his arrest and had visited on several prior occasions." *Id.*at 289.  In affirming the denial of the motion to suppress, the Court stated:  It is clear, however, that *Olson* stands for the proposition that not merely any temporary visitor, but only overnight social guests, may under certain circumstances be entitled to Fourth Amendment standing to challenge a search when present in another's home. *United States v. Phillips*, 382 F.3d 489, 495 (5th Cir. 2004). Wineinger's claim is nothing short of extravagant when considered against the backdrop of the Supreme Court's desire in *Olson* to "recognize and protect an expectation of privacy in the home of another when it is based on a visit which represents a longstanding social custom that serves functions recognized as valuable by society." *United States v. Phillips*, 382 F.3d 489, 495 (5th Cir. 2004) (*citing Olson*, 495 U.S. at 91, 110 S.Ct. at 1684).

Many courts have addressed a defendant's subjective expectation of privacy.[4]  The Court, however, has found no cases that separately address whether the expectation of privacy "serves functions recognized as valuable by society."  "A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as 'reasonable.'" *Minnesota v. Olson*, 495 U.S. at 96.  In *Olson*, the Supreme Court found that "Olson's status as an overnight guest was alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Id*.

In this case the Government argues that the house was never a home.  The Government introduced numerous photographs of the interior to demonstrate that with the exception of the few personal items described above, the remainder of the house was transformed into a commercial enterprise capable of generating a million dollars of marijuana.

The Fourth Amendment, however, is "presumptively applicable not only in an individual's home, but also in any commercial premises he may own or use." *U.S. v. Cardoza-*

---

[4] *See e.g. U.S. v. Fields*, 113 F.3d 313 (2d Cir. 1997).

*Hinojosa*, 140 F. 3d 610, 613 (5th Cir. 1998). Given the Defendant's responsibility for half of the rent for the premises, his possession of a key to the premises where he excluded individuals' entrance onto the property and excluded outsider viewing into the premises and the fact that he slept inside the premises on various occasions, the Court concludes that Defendant has established standing.

### B. Standing to challenge the obtaining of utility usage records

It is uncontested that Calzada was not the subscriber to the utilities at the house. Accordingly, he has no standing to challenge the manner in which the Government obtained that data. Alternatively, he had no legitimate expectation of privacy in this data. *See U.S. v. McIntyre*, 646 F.3d 1107, 1111 (8th Cir. 2011); *Gresham v. Carson*, 2012 WL 3916490 (D. Alaska, Sept. 7, 2012)( *"*Even if Mr. Gresham had standing to assert the privacy rights of Ms. Scheuner, the case law is well-established that a utility customer ordinarily lacks a reasonable expectation of privacy in an item, like a business record, in which he has no possessory or ownership interest.").

### C. Challenge to the warrant affidavit

Under the header of "bare bones," the Defendant challenges the affidavit claiming Det. Culp: (1) failed to identify in any meaningful fashion who the informant was that claimed the house was being used for a marijuana grow; (2) stated in a conclusory fashion that the house was vacant; (3) made a reference to the electricity consumption at the house without citing the source for the information; (4) provided no information to the magistrate providing a causal connection between the electricity consumption figures and a marijuana grow; (5) stated in a conclusory fashion that he smelled marijuana emanating from the home; (6) provided misleading electricity

consumption figures regarding the house to the magistrate; and (7) improperly climbed on the neighbor's roof and used binoculars to see through a crack in a window.

### D. Law applicable to affidavits in support of a search warrant

When reviewing a motion to suppress the Court engages in the following analysis. First, the court must determine whether the good faith exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897 (1984), applies. If so, no further analysis is conducted. If the good faith exception does not apply, the Court must proceed to the second step, ensuring that the magistrate had a substantial basis for concluding that probable cause existed. The good faith exception provides that evidence obtained by law enforcement officials acting in objectively reasonable good-faith reliance upon a search warrant is admissible even if the affidavit on which the warrant was grounded was insufficient to establish probable cause. *United States v. Shugart*, 117 F.3d 838, 843 (5th Cir. 1997).

An officer's reliance on a warrant is not objectively reasonable and, therefore, he is not entitled to invoke the good faith exception, if (1) the judge who issued the warrant acted after being misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) the judge who issued the warrant wholly abandoned his judicial role and failed to act neutrally, such that no reasonably well trained officer should rely on the warrant; (3) the affidavit upon which the warrant is founded is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable and is thus a "bare bones" affidavit; or (4) the warrant authorizing the officer's actions is so facially deficient that the executing officers cannot reasonably presume it to be valid. *United States v. Mays*, 466 F.3d 335, 343 (5th Cir. 2006).

Typically, the issuance of a warrant by a magistrate suffices to establish good faith on the part of law enforcement officers who conduct a search pursuant to the warrant. *United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988).

Probable cause simply requires "a fair probability" that evidence of a crime will be found and should be a "practical, common-sense decision." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *U.S. v. Triplett*, 684 F.3d 500, 506 (5th Cir. 2012)( "Probable cause is a practical assessment that all the circumstances generate a 'fair probability that contraband or evidence of a crime will be found in a particular place.'").

A probable-cause determination must be based on the "totality of the circumstances" rather than on isolation of "each factor of suspicion." *United States v. Saucedo-Munoz*, 307 F.3d 344, 351 (5th Cir. 2002) (*citing United States v. Arvizu*, 534 U.S. 266 (2002)).

For the reasons specified below, the Court finds that the law enforcement officials in this case acted in objectively reasonable good-faith reliance upon a search warrant. Accordingly, the good faith exception to the exclusionary rule announced in *United States v. Leon* applies. In the alternative, the Court will nevertheless proceed to the second step, ensuring that the magistrate had a substantial basis for concluding that probable cause existed.

**1. Citizen Informant**

Defendant apparently tries to argue that as in the case of a confidential informant, Det. Culp was required to provide the magistrate with some detail as to the informant's veracity. Defendant is mistaken. First, the information was not relayed by a confidential informant that required the corroboration of the informant's veracity, reliability, or the basis of his knowledge. Secondly, the inclusion of this introductory sentence was to provide the magistrate with background as to how the investigation began. It was not used as a basis for the establishment of

probable cause. Alternatively, if the magistrate did consider the statement, this Court in considering whether probable cause existed to search the house will not consider the statement. To the extent that Defendant offers the statement for support of any insinuation that the affiant included the information to mislead the magistrate, that insinuation is rejected. The information provided was not false.

### 2. Statement that the house was vacant

Defendant mischaracterizes what Det. Culp states in his affidavit. Det. Culp stated that he began an investigation, he saw the Defendant arrive at the premises and enter the house, saw fluorescent lights coming from the upstairs window, and "talked to neighbors who stated they rarely see anybody at the house and that they never saw any furniture being moved in." Det. Culp then stated "[n]obody has been physically living at the location since the previous residents moved out." Given the testimony at the suppression hearing, these statements were a fair representation of the facts and to the extent that Defendant is implying that Det. Culp misled the magistrate, that implication is incorrect.

### 3. Source of electricity consumption figures

In his affidavit Det. Culp stated that "Ybarra turned on CPS power to the location in March 2012." He then recited the electricity consumption figures he verbally obtained from SARIC. A fair reading of the affidavit makes clear that the consumption figures were obtained from the City Public Service, which a local magistrate in the San Antonio area would understand as the public utility company. To the extent that Defendant is implying that Det. Culp misled the magistrate by "making up numbers," that implication is incorrect. CPS records later obtained by SAPD indicate that the verbal information given to Det. Culp was slightly incorrect. The correct consumption numbers for January were 1138 KW and 564 KW usage for February. Even given

the correct information, neither the numbers supplied in the affidavit nor the newly corrected numbers were misleading to the magistrate. The house in question was using much more electricity than in previous months or in relation to other nearby houses.

### 4. Causal connection between the electricity consumption and a marijuana grow

Law enforcement officers have oftentimes secured electricity consumption reports to determine whether certain premises are being used as "marijuana grows."[5] Defendant misapprehends what was required to establish probable cause. Police officers have probable cause to search a residence if under the "totality of the circumstances" there is a fair probability that contraband or evidence of a crime will be found in a particular place. *U.S. v. Aguirre*, 664 F.3d 606, 610 (5th Cir. 2011). Facts in the affidavit must establish a nexus between the house to be searched and the evidence sought. *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982). The nexus may be established through direct observation or through "normal inferences as to where the articles sought would be located." *Id*. There has never existed a requirement that a law enforcement officer tender to a magistrate any scientific evidence establishing the electricity usage requirements required in marijuana grows to establish probable cause. Here, a common-sense reading is that there was a house suspected of being used for a "marijuana grow," that fluorescent light was seen from a window, that occupants of the house were rarely seen, and marijuana was smelled emanating from the house. The electricity consumption figures were but one additional factor in determining through "normal inferences" whether probable cause existed to issue the warrant.

---

[5] *See e.g. U.S. v. Hoang*, 487 Fed. Appx. 239 (6th Cir. 2012); *U.S. v. Thomas*, 605 F.3d 300 (6th Cir. 2010); *Gresham v. Carson*, 2012 WL 3916490 (D. Ala. Sept. 7, 2012); *U.S. v. Gaudette*, 2011 WL 31270 (D. Mass. Jan. 3, 2011); *U.S. v. Krotz*, 2008 WL 474342 (D. Neb. Feb. 15, 2008*); U.S. v. Cho*, 2006 WL 3798028 (N.D. Cal. Dec. 22, 2006).

**5. Det. Culp's statement that he smelled marijuana emanating from the home**

The Fifth Circuit recently restated its holdings with regard to probable cause based upon a qualified officer's smell of drugs. In *U.S. v. Newton*, 463 Fed. Appx. 462 (5th Cir. Mar. 8, 2012), the Court stated, in part, as follows:

> We have frequently held that probable cause to search may be based solely on a trained officer's detection of the odor of illicit drugs. *See, e.g., United States v. Ibarra–Sanchez*, 199 F.3d 753, 760 (5th Cir. 1999) ("This Court has consistently held that the smell of marihuana alone may constitute probable cause to search a vehicle."); *United States v. McKeever*, 906 F.2d 129, 132 (5th Cir. 1990) ("Distinctive odors, detected by those qualified to know them, may alone establish probable cause."); *Monnette v. United States*, 299 F.2d 847, 850 (5th Cir. 1962); *see Johnson v. United States*, 333 U.S. 10, 13, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) ("If the presence of odors is testified to before a magistrate and he finds the affiant qualified to know the odor, and it is one sufficiently distinctive to identify a forbidden substance, this Court has never held such a basis insufficient to justify issuance of a search warrant."). Other circuits are in accord. *See United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002); *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991); *see also* 2 Wayne R. LaFave, Search and Seizure: A treatise on the Fourth Amendment § 3.6(b), at 310–11 (4th ed. 2004).

Det. Culp is an experienced law enforcement officer and informed the magistrate that he had been conducting narcotics investigations for three years. The objection by Defendant that Det. Culp's statement was conclusory is frivolous. The Defendant's verbal objection raised at the suppression hearing that Det. Culp's information relayed to the magistrate was "stale" is overruled. Det. Culp relayed to the magistrate this information the very next day after smelling the plants at the premises.

### 6. Det. Culp provided misleading electricity consumption figures

As indicated above, Det. Culp was provided verbal information regarding the electricity usage of the premises and he used that verbal information in providing his affidavit to the magistrate. Sometime after the warrant was executed he was provided additional written information regarding electrical usage for the premises. The verbal information provided to Det. Culp was slightly misstated. The correct information was 1138 KW for the read done on February 3 and 564 KW for the read done on February 29. Det. Culp did not provide any false statement to the magistrate. He merely provided the verbal information relayed to him. In any event, the comparison charts done for the premises in question and the neighboring houses indicate that the electricity consumption for 10211 far exceeded the usage by neighboring homes.[6] The electricity consumption figures were properly utilized by the magistrate in determining under the "totality of the circumstances" there was a fair probability that contraband or evidence of a crime would be found at the premises.

### 7. Use of rooftop vantage and binoculars to peer into window

The Fifth Circuit has not appeared to definitely resolve whether the use of binoculars under these particular facts constitutes a search.[7] In this case, as part of his pre-warrant investigation, with the permission of a neighbor, Det. Culp positioned himself on the neighbor's roof. He used commercially available binoculars. He looked at a window that was covered from the inside with cardboard; however, the window was not fully covered on the bottom and one side. Through the cracks Det. Culp saw the marijuana plants.

This Court concludes the magistrate had a substantial basis for concluding that probable cause existed based upon Det. Culp personally "observ[ing] bright fluorescent lights coming

---

[6] *See* Defendant's Ex. 17 admitted during the suppression hearing.
[7] *U.S. v. Saitta*, 612 F.2d 205, 206 (5th Cir. 1980)("It is not necessary that we decide this issue because we conclude that the warrant was valid even without the fruits of the observation through the telescope and binoculars.").

from the upstairs windows on the south side of the house," his smelling marijuana coming from 10211 Dancing Brook, and the high electricity usage at the premises. Because sufficient probable cause existed based on these facts alone, the Court need not decide whether the rooftop vantage and use of binoculars constitutes a search.

### E. Stop of the Vehicle and Arrest of Defendant

Defendant argues that the stop of his vehicle without probable cause some four miles from the premises was illegal. He appears to argue that it was first necessary for police officers to execute the search warrant of the premises, find illegal substances, and then locate and arrest him. He does not address whether police officers under this theory would be first required to obtain an arrest warrant. Defendant relies upon *Bailey v. U.S.*, 133 S. Ct. 1031 (2013).

In *Bailey*, police obtained a warrant to search 103 Lake Drive for a .380 caliber handgun. The residence was a basement apartment. As the search unit began preparations for executing the warrant, two police detectives were conducting surveillance in an unmarked car outside the residence. They saw two men, both matching the description given by a confidential informant, leave the gated area above the basement apartment and enter a car parked in the driveway. The detectives watched the car leave the driveway. The search team then executed the search warrant at the apartment. The detectives followed Bailey's car for about a mile before pulling the vehicle over. They ordered the two men out of the car, did a "pat down" search, and discovered a ring of keys in Bailey's pocket (one of the keys was later found to open the apartment door). Bailey identified himself and said he was coming from his home at 103 Lake Drive. The officers put both men in handcuffs and informed them that they were being detained incident to the execution of a search warrant. *Id*. at 1036. The Supreme Court held that the stop was not within the

"immediate vicinity" of the premises and accordingly the detention was unreasonable. *Id*. at 1042-43.

In this case the warrant issued by the magistrate is unclear with regard to the making of arrests. The warrant commands law enforcement officers to "enter immediately and search" 10211 Dancing Brook for marijuana and to take possession of any marijuana found there. The warrant goes on to state "you are further commanded to arrest [Ybarra and Calzada] and to arrest any other parties found in said premises or making their escape therefrom…." The parties are in disagreement whether the search warrant served as a general arrest warrant that allowed the arrest of Ybarra and Calzada, wherever they were located. Or whether the warrant was merely a search warrant for the premises that allowed for the arrest of individuals located at the premises should contraband be discovered.

In addition to arguing that the warrant was a general arrest warrant, the Government in this case argues that *Bailey* is distinguishable. In *Bailey* the identities of the suspects were unknown when the search warrant was obtained. Accordingly, the Government argues that *Bailey* is limited to cases in which there is no probable cause or reasonable suspicion to arrest or detain. The Government further appears to argue that Defendant's arrest was not incident to the execution of a search warrant. In this case the Government argues that police officers had both reasonable suspicion and probable cause to arrest Calzada.

In order for an arrest to be lawful, it must be supported by probable cause. "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Massey v. Wharton*, 477 Fed. Appx. 256, 260 (5th Cir. June 5, 2012). The Court agrees that *Bailey* is not applicable in this case and the Court need

not determine the parameters of the warrant issued in this case. Based upon the same set of facts that supported the probable cause determination for the search of the house, the officers had probable cause to arrest Calzada. In the alternative, the warrant in this case also served as an arrest warrant for the Defendant regardless of his whereabouts. In any event, if the Court has erred in this determination, as stated above the search warrant for the premises was valid and even without the mason jar and key found as a result of the vehicle stop, the Defendant concedes that substantial evidence (both plants and various receipts for the equipment with his name) were found inside the house.

## Conclusion

The Court finds that Calzada has standing to contest the search of the house. Notwithstanding this finding, his motion to suppress is denied. The Court finds that the affidavit in support of the search warrant was not a "bare bones" affidavit. The Court finds that Calzada has no standing to challenge the disclosure of electricity records to the police. Alternatively, Calzada had no legitimate expectation of privacy in this data. The Court finds that the "good faith exception" to the exclusionary rule is applicable, and in the alternative, even excising the view of the marijuana plants from the roof with binoculars, there was probable cause to support the issuance of the warrant. The Court further finds that Calzada's arrest was supported by probable cause.

SIGNED this 18th day of March, 2013.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE